IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

PATRICIA P. FRANKS, :
:
    Claimant, :
:
v. : CASE NO. 7:07-CV-139 WLS
: Social Security Appeal
MICHAEL J. ASTRUE, :
Commissioner of Social Security, :
:
    Respondent. :

## **REPORT AND RECOMMENDATION**

    The Social Security Commissioner, by adoption of the Administrative Law Judge's determination, denied Claimant's application for social security disability benefits, finding that she was not disabled within the meaning of the Social Security Act and Regulations. Claimant contends that the Commissioner's decision was in error, and she seeks review under the relevant provisions of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). All administrative remedies have been exhausted.

## **LEGAL STANDARDS**

    The court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). The court's role in reviewing claims brought under the Social

Security Act is a narrow one. The court may not decide facts, reweigh evidence, nor substitute its judgment for that of the Commissioner.[1] *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). It must, however, decide if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). The court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth v. Heckler*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, it must be affirmed if substantial evidence supports it. *Id.* The initial burden of establishing disability is on the claimant. *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973). The claimant's burden is a heavy one and is so stringent that it has been described as bordering on the unrealistic. *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

A claimant seeking Social Security disability benefits must demonstrate that she suffers from an impairment that prevents her from engaging in any substantial gainful activity for a twelve-month period. 42 U.S.C. § 423(d)(1). In addition to meeting the requirements of these statutes, in order to be eligible for disability payments, a claimant must meet the requirements of the Commissioner's regulations promulgated pursuant to the authority given in the Social Security Act. 20 C.F.R. § 404.1 et seq.

Under the regulations, the Commissioner determines if a claimant is disabled by a

---

[1] Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). See also *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986).

2

five-step procedure. 20 C.F.R. § 404.1520, Appendix 1, Part 404. First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Next, the Commissioner determines whether the claimant's impairment(s) meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past work. Finally, the Commissioner determines whether the claimant's residual functional capacity, age, education, and past work experience prevent the performance of any other work. In arriving at a decision, the Commissioner must consider the combined effect of all the alleged impairments, without regard to whether each, if considered separately, would be disabling. *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). The Commissioner's failure to apply correct legal standards to the evidence is grounds for reversal. *Id.*

## **Administrative Proceedings**

Claimant filed an application for disability insurance benefits and supplemental security income payments on July 12, 2001. (T-83). Claimant's application was denied initially and upon reconsideration. *Id.* Claimant then filed a request for a hearing, which was held on September 19, 2005. *Id.* Subsequent to the hearing, the ALJ found that the Claimant was not disabled in a decision dated November 10, 2005. (T-16-25). Claimant then requested a review of the ALJ's findings by the Appeals Council. Thereafter, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

## Statement of Facts and Evidence

Claimant alleges that she is disabled due to an adjustment disorder, pulmonary hypertension, status post congestive heart failure and pulmonary emboli, obesity, chronic obstructive pulmonary disease, low back pain, arthritis, sleep apnea, migraine headaches, fibromyalgia, and a history of syncope. (R-12, p. 2-3). After examining the medical records, the ALJ determined that Claimant had pulmonary hypertension, status post congestive heart failure and pulmonary emboli, obesity, tobacco abuse disorder with consequent chronic obstructive pulmonary disease, low back pain, and arthritis, impairments that are severe within the meaning of the Regulations but not severe enough to meet, or medically equal, one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (T-21). The ALJ then found that Claimant had the residual functional capacity to perform a significant range of light work, with certain restrictions. (T-23).

## ISSUES

**I. Whether substantial evidence supports the ALJ's finding that the Claimant did not have an impairment or combination of impairments that were medically equivalent to a listed impairment?**

**II. Whether the ALJ improperly discounted Plaintiff's subjective allegations of pain and other symptoms?**

**III. Whether the ALJ failed to ask a complete hypothetical question to the vocational expert?**

# DISCUSSION

**I.   Whether substantial evidence supports the ALJ's finding that the Claimant did not have an impairment or combination of impairments that were medically equivalent to a listed impairment?**

Claimant argues that the ALJ erred in finding that Claimant did not have impairments which met or which were medically equal to impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1, 3.00, 3.02, 3.09, 3.10, 4.00 and 4.02.  (R-12, p. 4).

Chronic Obstructive Pulmonary Insufficiency

Section 3.00 relates to the respiratory system in general.  Section 3.02 sets out the specific requirements for chronic pulmonary insufficiency, as follows:

> A. Chronic obstructive pulmonary disease due to any cause, with the FEV1[2] equal to or less than the values specified in table I corresponding to the person's height without shoes. (In cases of marked spinal deformity, see 3.00E);
> Or
> B. Chronic restrictive ventilatory disease, due to any cause, with the FVC[3] equal to or less than the values specified in table II corresponding to the person's height without shoes. (In cases of marked spinal deformity, see 3.00E);
> Or
> C. *Chronic impairment of gas exchange due to clinically documented pulmonary disease.  With*:
>    1. Single breath DLCO (see 3.00F1) less than 10.5ml/min/mm Hg or less than 40 percent of the predicted normal value. (Predicted values must either be based on data obtained at the test site or published values from a laboratory

---

[2] FEV1 is the forced expiratory volume.  20 C.F.R. § 404, Subpt. P, App. 1, 3.00E.

[3] FVC is the forced vital capacity.  20 C.F.R. § 404, Subpt. P, App. 1, 3.00E.

> using the same techniques as the test site. The source of the predicted values should be reported. If they are not published, they should be submitted in the form of a table or nomogram); or
> 
> 2. Arterial blood gas values of PO, and simultaneously determined PCO2 measured while at rest (breathing room air, awake and sitting or standing) in a clinically stable condition on at least two occasions, three or more weeks apart within a 6-month period, equal to or less than the values specified in the applicable table III-A or III-B or III-C:
> 
> 3. Arterial blood gas values of PO2 and simultaneously determined PCO2 during steady state exercise breathing room air (level of exercise equivalent to less than 17.5 ml O2 consumption/kg/min or 5 METs) equal to or less than the values specified in the applicable table III-A or III-B or III-C in 3.02C2.

20 C.F.R. § 404, Subpt. P, App. 1, 3.02. A claimant is required to provide evidence of the specific requirements in order to meet a listing. Claimant was admitted to Tift Regional Medical Center on May 28, 2001, with arterial blood gases of: pH 7.42, PCO2 36, PO2 43. (T-209-11). On May 30, 2001, on 6 liters of nasal cannula, Claimant's blood gases were: pH 7.42, PCO2 44, PO2 50. On a 100% non-rebreather mask, Claimant's levels were: pH 7.44, PCO2 45, PO2 153, with an AA gradient of 513. (T-211). Although Claimant's arterial blood gas values on May 28, 2001, are less than the values in Table III-A[4], Claimant must have arterial gas values that qualify "on at least two occasions, three or more weeks apart within a 6-month period equal to or less than the values" specified in table III-A to

---

[4] Table III-A applies to test sites less than 3000 feet above sea level. 20 C.F.R. § 404, Subpt. P, App. 1, 3.02. The court takes judicial notice that the mean elevation in Georgia is 600 feet above sea level and that the elevation in Norman Park, Georgia, listed as Claimant's place of residence (R-1), is approximately 335 feet above sea level. *See* http://www.netstate.com/states/geography/ga_geography.htm and http://georgia.hometownlocator.com/GA/Colquitt/Norman-Park.cfm#maps.

meet or equal the listing requirement. 20 C.F.R. § 404, Subpt. P, App. 1, 3.02C2. The other values mentioned did not meet the listing. Additionally, Claimant's records from Phoebe Putney Memorial Hospital from June 2 -5, 2001, indicate that Claimant's PCO2 and PO2 levels did not meet the requirements as listed in table III-A. (T-254, 259-62). Nor did Claimant's medical records from Tift Regional Medical Center dated June 12-13, 2001, show corresponding PCO2 and PO2 levels while breathing room air, which met the requirements of table III-A. (T-263). The number of medical records that show that Claimant did not meet the listing requirements are plentiful (T-271, 276, 278, 314, 321, 345, 348, 380, 387, 407, 408, 415, 419, 427, 438, 455, 463, 467, 528, 530-31, 691, 730, 743, 817, 828, 835, 892), what is missing from the record, however, is any medical evidence to support Claimant's assertion that she did meet or equal Listing 3.02 (R-12, p. 5). As previously stated, the initial burden of establishing disability is on the claimant. *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973). Claimant has failed to meet her burden and present evidence of any claimed impairment and/or any combination of impairments which would meet the Listing.

Sleep Disorder

Claimant argues that she meets or equals the Listing requirements under 20 C.F.R. § 404, Subpt. P, App. 1, 3.09 and 3.10 (sleep apnea and sleep disorders). (R-12, p. 5). At an October 8, 2001, psychological evaluation with Dr. Nick Carden, Claimant reported that she had impaired sleep, but stated that "she sleeps without difficulty with the medications she is currently on." (T-327-30). In a medical record from Dr. Nancy L. McNair, Neurologist,

dated February 12, 2003, Dr. McNair noted that Claimant stated she was sleeping well while taking the Neurontin 300mg at night. (T-378). Claimant reported that she had a sleep test in March 2003, which was abnormal only in the sense of low oxygen saturation of 81%. (T-723). Claimant had an EEG[5] performed at the Medical College of Georgia Neuroscience Center on May 21, 2004, which was determined to be normal and showed no sign of epilepsy related abnormalities. (T-687). Although one physician thought a sleep study might be appropriate to rule-out narcolepsy, Dr. Blanchard "felt it was not clinically indicated at [that] time and felt patient could be studied as an outpatient if symptoms continued." (T-691). Claimant had a sleep study performed on July 29, 2004, which indicated mild obstructive sleep apnea which became more moderate when Claimant was in REM sleep. (T-799). On October 6, 2004, Claimant had another sleep study which indicated that except for initial insomnia, Claimant's sleep architecture and quality of sleep appeared normal. *Id.* Dr. Craig E. Wolff determined that Claimant's REM sleep was increased compared to her last sleep study. *Id.* Dr. Wolff determined that Claimant's obstructive sleep apnea was corrected using nasal C-PAP and determined that Claimant had no other sleep disorders. *Id.*

To determine if a claimant meets or equals the Listing either 20 C.F.R. § 404, Subpt. P, App. 1, 3.09 and/or 3.10, the Claimant must be evaluated under 3.09. Section 3.09 requires

---

[5] An Electroencephalogram (EEG) is a test that measures and records the electrical activity of the brain. Special sensors (electrodes) are attached to the head and hooked by wires to a computer. The computer records the brain's electrical activity on the screen or on paper as wavy lines. Certain conditions, such as seizures, can be seen by the changes in the normal pattern of the brain's electrical activity. Electroencephalogram, WebMD, http://www.webmd.com/epilepsy/electroencephalogram-eeg-21508 (Last visited April 14, 2008).

8

that Claimant show a "mean pulmonary artery pressure greater than 40 mm Hg" or show "arterial hypoxemia [which must be] evaluated under the criteria in 3.02C2. For the reasons stated above in the discussion of "chronic obstructive pulmonary insufficiency," Claimant has failed to provide evidence that she meets of medically equals Listing 3.02. Additionally, Claimant has wholly failed to provide any evidence of a "mean" artery pressure greater than 40 mm Hg. Claimant has failed to meet her burden, thus, this argument is without merit.

## Chronic Heart Failure

Claimant also argues that she meets or equals the Listing requirements under 20 C.F.R. § 404, Subpt. P, App. 1, 4.02 (chronic heart failure). (R-12, p. 5). Review of Claimant's medical records from the Cardiac Cath Lab at Tift Regional Medical Center dated August 8, 2002, show that Dr. William Hancock performed a coronary arteriogram of both the left and right coronary arteries and a left ventriculogram. (T-356-60). Dr. Hancock's findings were normal and his impression was: normal coronary arteries; normal left ventricular function; no mitral regurgitation or aortic stenosis; and mild pulmonary hypertension without shunt. (T-360). Dr. Hancock recommended medical therapy. *Id*. On October 2, 2002, Claimant was equipped with a 24 hour Holter Monitor[6], the results of which showed no significant rhythm and rate variability, a normal sinus rhythm, and was summarized as "an essentially normal Holter Monitor examination." (T-527). Claimant had ECGs performed on April 10, 2002, August 2, 2002, September 1, 2002, February 10, 2003, April 10, 2003, and May 5, 2003, all

---

[6] A Holter monitor is defined as "a techniques for long-term, continuous recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice." *Stedman's Medical Dictionary*, 26th Ed. (1995).

of which were normal. (T-504-5, 472-3, 456, 632, 428, 416). Claimant did, however, have atypical ECG on September 21, 2002. (T-442). On April 10, 2002, August 2, 2002, September 21, 2002 and April 10, 2003, after chest x-rays, Dr. James W. Keith, determined that Claimant's heart was normal in size. (T-490,466, 436, 423). On January 23, 2003, Dr. Nancy L. McNair noted that Claimant's heart was regular in rate and rhythm. (T-380). On January 30, 2003, Dr. James W. Keith performed a cardiolite scan which showed "no definite evidence of stress-induced ischemia." (T-638). On February 10, 2003, Dr. Blanchard found that Claimant's heart size was unremarkable after a chest x-ray. (T-631). On July 22, 2003, Dr. Gary Daniel determined that Claimant had trace to mild TR (tricuspid regurgitation) with mild pulmonary hypertension." (T-853). On May 5, 2003, a chest x-ray was performed in which Dr. Mark H. Blanchard noted that he saw "no evidence of pneumonia or congestive heart failure," and that "[t]he heart size appears unremarkable." (T-407). On August 6, 2003, Claimant had a right cardiac catherization performed by Dr. Michael Villano. (T-845-46). Dr. Villano determined that Claimant had "[n]ear normal right heart pressure with normal cardiac output and normal cardiac indices" and "[n]ormal pulmonary vascular resistance." (T-846). On September 4, and 22, 2003, Claimant had normal ECGs. (T-841, 819). In her discharge summary from the Medical College of Georgia in May 2004, Dr. Amy Marks noted that Claimant's heart had regular rate and rhythm, with a 1/6 murmur heard best at the apex. (T-690-693). Dr. Marks specifically noted that Claimant's EKG showed a normal sinus rhythm with a rate of 81 and that cardiac enzymes were negative. (T-691). The staff at the Medical College of Georgia tested Claimant to determine the cause of her syncope. *Id*.

10

Claimant "had cardiac dopplers on the day after admission, which were unremarkable" and Claimant's cardiac enzymes remained negative after three tests. *Id.* Dr. Marks also noted that Claimant's fiancé brought some of Claimant's old records to the hospital which "indicated that the [claimant] had a normal cardiac catherization in 2002 and 2003, showing normal coronary arteries [and a] normal stress test in 2002." (T-691-92). In discussing Claimant's discharge, Dr. Marks stated:

> The case was discussed with Dr. Gossage, who felt comfortable with the plan of action and we felt she could be discharged, given the lack of symptoms as an in-patient and the lack of evidence of any cardiovascular or pulmonary cause. She continued to have two or three episodes of chest pain per day and stated the pain was sharp. Given her negative cardiac workup in the past and her negative cardiac enzymes with no change in telemetry, it was felt this might be related to reflux or esophageal causes. The patient was placed on Nexium as prophylaxis at the time of admission and stated she felt great relief from reflux symptoms, which had previously been unmentioned, and also her Isordil was discontinued and exchanged for a calcium channel blocker to help with possible esophageal spa[s]m. The night prior to discharge the patient was placed on continuous pulse oximetry to rule out desaturation at night. She remained on room air with saturations in the 90s. Per history, she notes desaturation on exertion. It was felt that Seroquel, which may cause hypertension, may be part of the culprit, as may Isordil. Dr. Gossage felt that he did not need to follow with the patient unless her pulmonary symptoms worsened, as her pulmonary hypertension was considered extremely mild. Dr. Newman discussed lifestyle changes such as weight loss, discontinuing tobacco use and getting more regular exercise as potential lifestyle modifications which may improve her quality of life. The patient is being discharged in stable condition.

(T-692). The objective medical testing performed by the various physicians at the Medical College of Georgia in May 2004, indicate that Claimant's heart was normal and that she has

11

only mild pulmonary hypertension of a passive nature. (T-696, 698, 699, 707, 716-717, 719). Claimant has completely failed to carry her burden to provide evidence that she meets or equals 20 C.F.R. § 404, Subpt. P, App. 1, 4.02 (chronic heart failure).

Lastly, claimant contends that the ALJ erred in failing to properly evaluate all of her impairments in combination. (R-12, p. 5). Claimant argues that the ALJ has a duty to "make specific and well-articulated findings as to the effects of the combination of impairments and to decide whether the combined impairments cause the Claimant to be disabled" pursuant to *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987). As is required by 20 C.F.R. §§ 404.1523 and 416.923, the ALJ, after determining that Claimant had impairments which were severe, took into account each of her medically determinable impairments in finding that she could still perform some work. Therefore, this contention is also without merit.

II. **Whether the ALJ improperly discounted Plaintiff's subjective allegations of pain and other symptoms?**

In her Brief, the Claimant next contends that the ALJ applied an incorrect legal standard in evaluating Claimant's subjective allegations of pain and alleged non-exertional impairments. (R-12, p. 9). Social Security Regulation 96-7p states in relevant part, that:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on

12

> his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

Additionally, 20 C.F.R. § 416.929(a), in relevant part, states that:

> Statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

The Eleventh Circuit has held that in order for a claimant's subjectively alleged pain to be deemed credible by the ALJ, he must *first* show "evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The Eleventh Circuit has also held that:

> [W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to a specific credibility finding. . . . Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.

*Foote v. Chater*, 67 F. 3d 1553, 1562 (11th Cir. 1995), *quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983).

In his Findings, the ALJ discussed Claimant's medical history and cited to medical evidence regarding the Claimant's allegations of the severity of her pain and non-exertional impairments. (T-21-22). The ALJ then referenced the pain standard and discussed Claimant's activities of daily living. (T-22). The ALJ acknowledged the requirements and procedures he must follow in assessing Claimant's residual functional capacity, making specific reference to 20 C.F.R. § 416.929 and Social Security Ruling 96-7p. *Id*. The ALJ considered Claimant's testimony, medical evidence provided by the Claimant, and her functional restrictions to find that Claimant's allegations of pain and limitations were less than credible, and that the medical evidence of record did not support the severity alleged. (R-22-23).

In evaluating credibility, "[b]ased on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible." S.S.R. 96-7p. A limitation cannot be established solely by a claimant's own report. *See* 20 C.F.R. § 416.928(a). The record must contain medical evidence, in the form of observable abnormalities or laboratory findings, that "shows the existence of a medical impairment(s) . . . which could reasonably be expected to produce" the alleged limitation. *Id*. Applying the *Holt* test to this Claimant's pain allegations, the Court finds that the Claimant failed to overcome the Findings of the ALJ by establishing either that the medical evidence confirmed the severity of her pain or that her medical conditions were so severe as to reflect the alleged pain and limitations. As noted above, the court may not decide facts, re-weigh evidence, nor substitute its judgment for that of the Commissioner, but must decide if the

Commissioner applied the proper standards in reaching a decision. Here, the ALJ applied the proper standards and supported his credibility assessment with substantial evidence in the record. As such, no error is found in the ALJ's evaluation of Claimant's subjective allegations of pain and limitations.

**III.     Whether the ALJ failed to ask a complete hypothetical question to the vocational expert?**

The ALJ found that Claimant had the residual functional capacity to perform a significant range of light work. (T-23). Claimant, however, contends that the ALJ erred by failing to find her disabled where the vocational expert testified that the limitations due to Claimant's syncope would preclude work. (R-8, p. 11).

It is the law of this circuit that hypothetical questions posed to a vocational expert must contain adequate assumptions or the answers given cannot constitute substantial evidence of ability to engage in substantial gainful activity. *Stubbs v. Mathews*, 544 F.2d 1251, 1256-57 (5th Cir. 1977). *See also Freeman v. Schweiker*, 681 F.2d 727, 730 (11th Cir. 1982); *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980). Taken further, hypothetical questions posed to vocational experts by ALJs must set out precisely the claimant's particular physical and mental impairments. *Taylor v. Sullivan*, 951 F.2d 878, 882 (8th Cir. 1991). *See also Kosman v. Shalala , 1993 U.S. App. LEXIS 9108 (9th Cir.)*. In addition, a hypothetical need only contain a claimant's credible limitations. *See Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998).

"No symptom or combination of symptoms[7] can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms." SSR 96-7p; *see also, Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). The staff at the Medical College of Georgia tested Claimant to determine the cause of her syncope. (T-691). Claimant "had cardiac dopplers on the day after admission, which were unremarkable" and Claimant's cardiac enzymes remained negative after three tests. *Id*. On May 19, 2004, Claimant's physicians at the Medical College of Georgia performed a "cardiac duplex examination" due to Claimant's complaints of syncope, but the testing revealed a normal study of the carotids. (T-707). On May 20, 2004, Claimant had a "head up tilt table test" at the Medical College of Georgia to discover the origin of her syncope, but the test was "negative for neurocardiogenic syncope." (T-699). After all testing done to discover the cause of Claimant's syncope was determined to be negative, "[psychiatry was consulted and felt that conversion disorder was a possibility, however, felt is was a diagnosis of exclusion." (T-691). It was noted that Claimant remained syncope free after the day of admission. *Id*.

Other circuits have held, and this court believes common sense dictates, that an ALJ is not required to include in his hypothetical questions to the vocational expert, limitations that he does not accept as true. *See Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990); *Copeland v. Bowen*, 861 F.2d 536, 540-

---

[7]A symptom is an individual's own description of his physical or mental impairments.

41 (9th Cir. 1988). Therefore, the ALJ was under no obligation to include the alleged side effects of Claimant's syncope and other unproven ailments in his hypothetical question to the vocational expert. Furthermore, the burden is upon Claimant to introduce into the record such medical documentation. *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973). The Court finds that the hypothetical included all of Claimant's credible limitations.

## **CONCLUSION**

In reviewing the record, no evidence of error is found to substantiate the Claimant's contention the ALJ erred in finding that she did not meet or equal a Listed impairment, that the ALJ improperly discounted Plaintiff's subjective allegations of pain and non-exertional impairments, or that the ALJ erred in failing to ask a complete hypothetical question to the vocational expert. This Court finds that the decision of the ALJ is supported by substantial evidence. Furthermore, the record fails to reveal evidence of the ALJ acting outside of his judicial role in determining the extent of the Claimant's disability.

**WHEREFORE**, it is the recommendation to the United States District Judge that the decision of the defendant Commissioner of Social Security be **AFFIRMED**.

Pursuant to 28 U.S.C. § 636(b)(1), Claimant may serve and file written objections to this recommendation with the UNITED STATES DISTRICT JUDGE within ten (10) days after being served a copy of this recommendation.

THIS the 17th day of April, 2008.

S/ G. MALLON FAIRCLOTH
UNITED STATES MAGISTRATE JUDGE

mZc